UNITED STATES of America, Appellee,

v.

Joseph MAGNANO, a/k/a "Joe the Grind", et al., Defendants-Appellants.

1011, 76–1058, 76–1062, 76–1064 and 76–1137.

United States Court of Appeals, Second Circuit.

Argued May 5, 1976.

Decided Sept. 7, 1976.

Gretchen White Oberman, New York City, for defendants-appellants Magnano and Pallatta.

Gilbert Epstein, New York City (Stokamer & Epstein, New York City, on the brief), for defendant-appellant Bollella.

H. Richard Uviller, New York City, for defendant-appellant De Lutro.

Robert Blossner, New York City, for defendant-appellant Soldano.

Jeffrey C. Hoffman, New York City (Steven Duke and John L. Pollok, New York City, of counsel), for defendant-appellant Lucas.

Dominic F. Amorosa, Asst. U.S. Atty., New York City (Robert B. Fiske, Jr., U.S. Atty., S.D.N.Y., New York City, Nathaniel H. Akerman, Federico E. Virella, Jr., Howard S. Sussman, Lawrence B. Pedowitz and John C. Sabetta, Asst. U.S. Attys., New York City, of counsel), for appellee.

Before HAYS and MULLIGAN, Circuit Judges, and PALMIERI, District Judge.[*]

HAYS, Circuit Judge:

Defendants-Appellants, asserting a host of alleged errors below, appeal from judgments of conviction for conspiring to traffic in narcotics and substantive violations of the narcotics laws. Only six of appellants' many arguments warrant discussion in this opinion. We have carefully considered each of the numerous claimed infirmities in their convictions and find none to be meritorious.

The facts adduced at trial evidenced a narcotics conspiracy network not dissimilar, except perhaps in the quantities involved, from many such conspiracies this Court has been called upon to review. The conspiracy, in broad outline, assumed the customary structure of suppliers, distributors, and retailers. Some members of the conspiracy, depending on their functional level, dealt only with a few other members above or below them while other members transacted business up and down the chain. The evidence at trial, as found by the jury, proved that appellants Pallatta, Magnano, Bollella, De Lutro and Soldano individually and/or collectively sold heroin to the partnership of Ernest Malizia, Mario Perna and Anthony Verzino ("the distributors" or "the core group"). Malizia is a fugitive; Perna and Verzino were unindicted coconspirators who testified for the Government. Appellant Lucas, a retailer, was the distributor's largest customer and, controlling his own large street level distribution network, purchased in excess of 100 pounds of heroin during the conspiracy.

## I. Single Conspiracy

As is usual in narcotics conspiracy cases the allegation is here made that although the defendants were indicted and convicted as members of a single conspiracy the proof at trial showed multiple conspiracies. *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). Thus, while Magnano, Bollella and Pallatta jointly supplied the distributors, it is claimed that they formed no part of a conspiracy involving the other two suppliers, De Lutro and Soldano, each of whom also sold narcotics to the distributors. The appellants claim the existence of at least three distinct conspiracies with each conspiracy defined by the supplier. In support of this claim appellants rely on the distinguishing facts that the distributors bought from De Lutro and from Soldano only once. Both these transactions were for pure heroin on a cash basis. In contrast, the transactions with the Magnano-Bollella-Pallatta partnership were numerous, generally credit exchanges and for diluted heroin.

We find the multiple conspiracy argument pressed by appellants with their particular emphasis on the single act doctrine singularly unpersuasive. Precedent

[*] Of the Southern District of New York, sitting by designation.

within this Circuit abounds for the proposition that one who deals in large quantities of narcotics may be presumed to know that he is a part of a venture which extends beyond his individual participation. *United States v. Ortega-Alvarez,* 506 F.2d 455, 457 (2d Cir. 1974), *cert. denied,* 421 U.S. 910, 95 S.Ct. 1559, 43 L.Ed.2d 775 (1975); *United States v. Mallah,* 503 F.2d 971, 983–84 (2d Cir. 1974), *cert. denied,* 420 U.S. 995, 95 S.Ct. 1425, 43 L.Ed.2d 671 (1975); *United States v. Sisca,* 503 F.2d 1337, 1345 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974); *United States v. Arroyo,* 494 F.2d 1316, 1319 (2d Cir.), *cert. denied,* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); *United States v. Bynum,* 485 F.2d 490, 495–96 (2d Cir. 1973), *vacated and remanded on other grounds,* 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). The nature of the enterprise determines whether this presumption or inference of knowledge of broader scope and participation in a single conspiracy is justified. *United States v. Agueci,* 310 F.2d 817, 827 (2d Cir. 1962), *cert. denied,* 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963). The suppliers in the instant conspiracy, each of whom dealt directly with a member or members of the distribution core group of Perna, Malizia and Verzino, provided that group with approximately 140 pounds of heroin. By virtue of this quantity the vertical nature of the conspiracy was known to the suppliers and customers. As expressed in *United States v. Bruno,* 105 F.2d 921, 922 (2d Cir.), *rev'd on other grounds,* 308 U.S. 287, 60 S.Ct. 198, 84 L.Ed. 257 (1939):

"[T]he smugglers knew that the middlemen must sell to retailers, and the retailers knew that the middlemen must buy of importers of one sort or another. Thus the conspirators at one end of the chain knew that the unlawful business would not, and could not, stop with their buyers; and those at the other end knew that it had not begun with their sellers."

The quantities involved, moreover, permit the inference that the suppliers must have known their was a horizontal scope to the conspiracy such that others were similarly performing in the supply role. *See United States v. Miley,* 513 F.2d 1191, 1207 (2d Cir. 1975), *cert. denied,* 423 U.S. 842, 96 S.Ct. 74, 46 L.Ed.2d 67 (1976); *United States v. Bynum, supra,* 485 F.2d at 495–497. This *inference* of knowledge, furthermore, is buttressed by evidence that the Magnano-Bollella-Pallatta partnership had *actual* knowledge that the distributors were purchasing from another source with monies owed to the partnership from credit sales to the core group.[1]

█ For much the same reasons the fact that De Lutro and Soldano each only consummated one transaction with the core group does not render their participation insufficient to warrant their inclusion in the single conspiracy charged. The so-called single transaction rule, *see, e. g., United States v. DeNoia,* 451 F.2d 979, 981 (2d Cir. 1971) *(per curiam); United States v. Aviles,* 274 F.2d 179, 190 (2d Cir.), *cert. denied,* 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960); *United States v. Stromberg,* 268 F.2d 256, 267 (2d Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959), recognizes that a single isolated act does not, *per se,* support an inference that a defendant had knowledge of, or acquiesced in, a larger conspiratorial scheme. It is only "when there is no independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy and when the single transaction is not in itself one from which such knowledge might be inferred," *United States v. Agueci, supra,* 310 F.2d at 836, that the single act

---

1. Appellants' reliance on *United States v. Bertolotti,* 529 F.2d 149 (2d Cir. 1975), is misplaced. In *Bertolotti* the indictment charging a single conspiracy was held to be an improper consolidation of at least four separate and unrelated criminal ventures involving an assortment of "unorthodox and diverse transactions," *id.* at 155, such as to preclude an inference of knowledge. The instant case, in contrast, involves only narcotics transactions and is characterized by the usual structural framework employed by participants in a narcotics distribution scheme.

is an insufficient predicate upon which to link the actor to the overall conspiracy. *See, United States v. Sperling,* 506 F.2d 1323, 1342 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975); *United States v. Reina,* 242 F.2d 302, 306 (2d Cir.), *cert. denied,* 354 U.S. 913, 77 S.Ct. 1294, 1 L.Ed.2d 1427 (1957). Each of the "single acts" here—De Lutro's sale of five kilos pure heroin and Soldano's sale of three kilos—was to core members of the conspiracy and of such a magnitude as to justify "an inference that each knew he was involved in a criminal enterprise of substantial scope." *United States v. De-Noia, supra,* 451 F.2d at 981. *See, United States v. La Vecchia,* 513 F.2d 1210, 1219 (2d Cir. 1975); *United States v. Tramunti,* 513 F.2d 1087, 1111–12 (2d Cir.), *cert. denied,* 419 U.S. 1079, 95 S.Ct. 667, 42 L.Ed.2d 673 (1975); *United States v. Torres,* 503 F.2d 1120, 1124 (2d Cir. 1974).[2]

II. *Prior Similar Crimes Evidence*

Government witness Verzino was permitted to testify to narcotics dealings he had with appellants Pallatta, Magnano, De Lutro, Bollella and Lucas several years before the conspiracy charged in the indictment commenced. Appellants claim admission of this testimony was error. We disagree.

[7, 8] The prior similar crimes testimony was admitted to explain how Verzino, who had been incarcerated from 1966 through August, 1973, was able to become an ac-cepted member of the conspiracy upon his release. Evidence of prior criminal acts is admissible unless offered solely to prove criminal character or disposition or the proffered evidence is of such a highly prejudicial nature as to overwhelm its probative value. *United States v. Santiago,* 528 F.2d 1130, 1134 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976). Here, as in *United States v. Natale,* 526 F.2d 1160, 1173–74 (2d Cir.), *cert. denied,* 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 193 (1976), the Government offered the prior crime evidence for the legitimate purpose of showing the background and development of the conspiracy, and the district judge, properly exercising his discretion, committed no error in allowing its admission.

III. *The Charge to the Jury*

Appellants have compiled an assortment of claimed errors in the trial court's instructions which they argue compel reversal. Reviewing the instructions as a whole, *Cupp v. Naughton,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), we find these claims devoid of merit. We here address only the errors claimed in the court's instructions on reasonable doubt.

The remaining objections raised on appeal are either too frivolous to warrant discussion or, because of the failure to object below, have been waived, Fed.R. Crim.P. 30; *United States v. Ingenito,* 531 F.2d 1174, 1176 (2d Cir. 1976), and are not

2. While we reject appellants' protestations of multiple conspiracies, even if we were to find the error of variance to have been committed, we would nevertheless find reversible error absent. As we have so often noted, "the test for reversible error, if two conspiracies have been established instead of one, is whether the variance affects substantial rights. Fed.R.Crim.P. 52(a). The material inquiry is not the existence but the prejudicial effect of the variance." *United States v. Agueci, supra,* 310 F.2d at 827. *See United States v. Sir Kue Chin,* 534 F.2d 1032, 1035 (2d Cir. 1976) and cases cited therein. Each of these appellants was actively engaged in the drug world in a large-scale capacity. None was a minor participant joined in trial with top echelon personnel such that proof of the guilt of major violators contaminated the jury's consideration of his guilt individually. *See United States v. Miley, supra,* 513 F.2d at 1209. Nor were the jury's deliberations infected by highly inflammatory testimony about any one of the codefendants which might spill over to the prejudice of others. *Compare United States v. Bertolotti,* 529 F.2d 149, 157–58 (2d Cir. 1975). Essentially the argument of prejudice here is merely a bald assertion that each would have fared better had he been tried alone. As we said in *United States v. Borelli,* 435 F.2d 500, 502 (2d Cir. 1970), *cert. denied,* 401 U.S. 946, 91 S.Ct. 963, 28 L.Ed.2d 229 (1971), an appellant "must demonstrate substantial prejudice from a joint trial, not just a better chance of acquittal at a separate one . . . " *See United States v. Fantuzzi,* 463 F.2d 683, 687 (2d Cir. 1972).

such as to be saved by the plain error exception. Fed.R.Crim.P. 52(b).[3]

■■■ Appellants vigorously argue that the court's failure to instruct the jury, as requested, in the express language of *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 99 L.Ed. 150 (1954) is reversible error. *Holland* defines reasonable doubt as a doubt that would cause a person to hesitate to act in matters of importance in his own life. The judge below instead instructed the jury[4] that reasonable doubt is "an abiding conviction of his guilt which amounts to a moral certainty—I mean such conviction or certainty as you would be willing to act upon in important and weighty matters in your own personal affairs in your own private lives."

This Court has repeatedly expressed the desirability of *Holland's* "hesitate to act" language and suggested its use as preferable to alternative phraseologies. *See United States v. Acarino,* 408 F.2d 512, 517 (2d Cir.), *cert. denied,* 395 U.S. 961, 89 S.Ct. 2101, 23 L.Ed.2d 746 (1969); *United States v. Hart,* 407 F.2d 1087, 1091 (2d Cir.), *cert. denied,* 395 U.S. 916, 89 S.Ct. 1766, 23 L.Ed.2d 231 (1969); *United States v. Bilotti,*

**3.** We briefly note appellants' claim relating to the court's accomplice testimony instruction. The claim is made that the trial court's instructions on this issue were totally inadequate because they failed to include the cautionary language of *United States v. Padgent,* 432 F.2d 701, 704 (2d Cir. 1970), which warns that "[a]n accomplice so testifying may believe that the defendant's acquittal will vitiate expected rewards that may have been either explicitly or implicitly promised him in return for his plea of guilty and his testimony." As we said in *United States v. Bermudez,* 526 F.2d 89, 99 (2d Cir. 1975), however, the *Padgent* language was suggested not for jury instructions but in the context of permitting an expansive scope for cross examination. The district court fully and adequately flagged the pitfalls of accomplice testimony for the jury's attention; the appellants have no serious ground for complaint.

**4.** The court's definition of reasonable doubt was in full as follows:

Now, let's go to reasonable doubt. There is no mystery about it. An intelligent high school student can capture its full essence. What does the law mean by reasonable doubt? How much evidence does the government have to place before a jury in any criminal case? Must it be evidence beyond any possible doubt? Absolutely not. The words are reasonable doubt, and they mean that there is a doubt founded in reason, not imaginary, but founded in reason, and arising out of the nature of the evidence in the case or the lack of evidence in the case. It means a doubt which a reasonable person has after carefully weighing all the evidence. It means a doubt that is substantial and not shadowy. A reasonable doubt is a fair doubt, a doubt which appeals to your reason, your judgment, your common sense, your understanding, and arising from the state of the evidence.

A defendant is not to be convicted on suspicion, conjecture, or even impressive evidence which does not rise to the dignity of significant persuasiveness.

Reasonable doubt is not caprice, whim, speculation. It is not an excuse to avoid the performance of an unpleasant duty. It is not sympathy for a defendant or a desire to uphold the government. If after a careful and impartial consideration of all the evidence in the case from start to finish you can candidly and honestly say that you are not satisfied of the guilt of a defendant and that you do not have an abiding conviction of his guilt which amounts to a moral certainty, then you have a reasonable doubt, and in that circumstance it is your duty to acquit.

On the other hand, if after such a fair and impartial consideration you can candidly and honestly say that you are satisfied of the guilt of a defendant, that you do have an abiding conviction of his guilt which amounts to a moral certainty—I mean such conviction or certainty as you would be willing to act upon in important and weighty matters in your own personal affairs in your own private lives—then you have no reasonable doubt, and in that circumstance it is your sworn obligation to convict.

One final word on this subject of reasonable doubt. Reasonable doubt does not mean a positive certainty or beyond all possible doubt. This is not a mathematical problem. You are dealing with human beings, the flesh, the bone, the tissue. If the rule were you had to be satisfied beyond all possible doubt few men, however, guilty they might be, would ever be convicted, for it is practically impossible for a person to be absolutely and completely convinced of any controverted fact which by its very nature is not susceptible of mathematical certainty. And so, in consequence, the test in a criminal case is that it is sufficient if guilt of the defendant is established beyond a reasonable doubt, not beyond all possible doubt.

380 F.2d 649, 654 (2d Cir.), *cert. denied,* 389 U.S. 944, 88 S.Ct. 308, 19 L.Ed.2d 300 (1967); *United States v. Nuccio,* 373 F.2d 168, 174–75 (2d Cir.), *cert. denied,* 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967). In each of these cases, however, we found as we find in the instant appeal, that this difference of nuance does not constitute reversible error. Reading the entire charge it is clearly apparent that the substance of reasonable doubt was fairly conveyed to the jury.

Objection is made to the court's instruction that a reasonable doubt is "a doubt founded in reason," and it is "a doubt that is substantial and not shadowy." Such characterization is not erroneous, *United States v. Aiken,* 373 F.2d 294, 299 (2d Cir.), *cert. denied,* 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed.2d 93 (1967), and in the context of the entire charge was not misleading. Similarly, appellants objections to that part of the instruction advising the jury that reasonable doubt "is not an excuse to avoid the performance of an unpleasant duty" and that if "the rule were you had to be satisfied beyond all possible doubt few men, however guilty they might be, would ever be convicted," are without merit. *See United States v. Barrera,* 486 F.2d 333, 339 (2d Cir. 1973), *cert. denied,* 416 U.S. 940, 94 S.Ct. 1944, 40 L.Ed.2d 291 (1974). While this portion of the charge in isolation may be unduly favorable to the Government, *see United States v. Shaffner,* 524 F.2d 1021, 1023 (7th Cir. 1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976), it is not prejudicially erroneous when the charge is considered as a whole and especially when, as here, no objection was made below.

## IV. *Admission of Cash into Evidence*

■ The Government introduced into evidence slightly more than one-half million dollars in cash seized, pursuant to search warrant, from appellant Lucas' home on the day of his arrest. Appellants claim this to be prejudicial error arguing that the seizure took place nearly one year after the con-spiracy terminated and that there was no connection between the cash and the crime charged. We reject this contention.

At the time the cash was seized drug paraphernalia was also found. These items, both the cash and instruments, were admissible evidence relevant to Lucas' participation in the conspiracy. Moreover, Government witnesses testified that Lucas owed the core group several hundred thousand dollars at the time of his arrest. As we said in *United States v. Tramunti, supra,* 513 F.2d at 1105, "[t]he possession of large amounts of unexplained cash in connection with evidence of narcotics trafficking on a large scale is similar to the possession of special means, such as tools or apparatus, which is admissible to show the doing of an act requiring those means." That the evidence is obtained by search conducted after the termination of a conspiracy does not preclude admissibility. *United States v. Bermudez, supra,* 526 F.2d at 95. Moreover, we do not find that the introduction of the physical evidence of the cash was so inflammatory or prejudicial to outweigh its probative value as appellants contend.

## V. *Soldano Identification*

■ Appellant Soldano contends that the court erred in failing to hold a pre-trial evidentiary hearing to determine whether a photographic display in which Verzino identified Soldano was impermissibly suggestive. We need not explore the merits of this contention since, even assuming for purposes of decision that a hearing was warranted, no prejudice is cited by the appellant which would support reversal of his conviction.

The pre-trial photographic identification of Soldano by Verzino was not introduced by the Government at trial. Rather, Verzino made an in-court identification of Soldano after testifying to several face to face meetings he and Soldano had prior to consummating a narcotics transaction. This testimony firmly established an independent basis for the in-court identification. On cross-examination Soldano's counsel had

full opportunity to explore the circumstances of the pre-trial identification at which Soldano's picture was one of 32 pictures shown to Verzino. Even on appeal counsel does not seriously argue that the display was impermissibly suggestive or advance any real claim of prejudice suffered therefrom. In *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968), the Supreme Court held "that convictions based on eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Appellant's claim clearly does not meet that standard and must fail.

VI. *Brady Disclosure Subsequent to Trial*

■ Two weeks after trial ended the Government furnished appellants' counsel and the court with three written statements of Mario Perna, a chief Government witness at trial. Appellants immediately moved for a new trial based on newly discovered evidence pursuant to Fed.R.Crim.P. 33. This motion was denied without an evidentiary hearing. In its order the court below found the Government's failure to disclose these statements earlier was inadvertent; that the statements would not have produced a different verdict if available at trial; that the statements were at best cumulative on the issue of credibility and without bearing on the issue of defendants' guilt; and that Perna's testimony was corroborated at trial by other evidence.

We find these findings of the district court fully supported in the record. As such, the court's denial of the motion on the basis of affidavits and without an evidentiary hearing was not error. *See, United States v. Persico,* 339 F.Supp. 1077 (E.D.N.Y.), *aff'd,* 467 F.2d 485 (2d Cir. 1972), *cert. denied,* 410 U.S. 946, 93 S.Ct. 1360, 35 L.Ed.2d 613 (1973). *Cf., United States v. Franzese,* 525 F.2d 27 (2d Cir. 1975).

Affirmed.